IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**DEBRA A. MORRIS**

   **Plaintiff,**

**vs.**                **CIV No. 02-0182MCA/WDS**

**JO ANNE B. BARNHART, Commissioner**
**of the Social Security Administration,**

   **Defendant.**

## MEMORANDUM OPINION AND ORDER

  **THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse or Remand the Administrative Agency Decision, filed June 21, 2002.  **[Doc. 6]**  An identical motion was filed on July 8, 2002 **[Doc. 8]** along with a Memorandum Brief in Support of Plaintiff's Motion to Reverse or Remand the Administrative Agency Decision.  **[Doc 9]**  Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security denying Plaintiff's claim for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income.  For the reasons stated below, the United States Magistrate Judge, having considered the Motion, memoranda, administrative record, and applicable law, recommends that the Motion be granted in part and denied in part.

### Background

  On July 8, 1999, Plaintiff filed an application for Supplemental Security Income.  Tr. 15.  On July 31, 1998, she filed an application for Disability Insurance Benefits.  Tr. 53-59.  Plaintiff alleged in her application that she had been unable to work because of her disabling condition since May 1, 1994.  Tr. 53.  An amendment to her application stated that she became unable to work on November 1, 1997.  Tr. 58.

Plaintiff's application was denied at the initial level on April 30,1999, Tr. 37-40 and at the reconsideration level on August 18, 1999.  Tr. 43-45.  Plaintiff appealed by filing a Request for Hearing by Administrative Law Judge ("ALJ") on December 21, 1999. Tr. 46.

The ALJ held a hearing on February 23, 2000, at which Plaintiff appeared and was represented by an attorney. Tr. 373.  In a decision dated June 28, 2000, the ALJ denied Plaintiff's request for both Disability Insurance Benefits and Supplemental Security Income.  Tr. 15-31.

Plaintiff filed a request for review with the Appeals Council on December 21, 2000. Tr. 6. Included with the Request for Review were numerous exhibits including three pages of records and notes from Transitional Living Services. Tr. 367-69.  Those three pages were eventually made part of the record. Tr. 7.   On October 11, 2001, Plaintiff submitted a Second Request for Tape and Transcript to the Appeals Council.[1] Tr. 9.  On November 9, 2001, a tape of the hearing was sent to Plaintiff and Plaintiff was informed that, "The Appeals Council will defer action on this case for a period of 40 days awaiting receipt of any additional evidence or arguments you may wish to submit." Tr. 8.  The Appeals Council denied Plaintiff's request for review on January 23, 2002, and thereby rendered the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner"). Tr. at 5-6.

Plaintiff filed this action on February 14, 2002 in which she seeks judicial review of the Commissioner's final decision.  The parties subsequently consented to have the undersigned United States Magistrate Judge conduct all proceedings **[Doc. 15 and 17]**, and on February 24, 2004, this case was reassigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C.

---

[1] Plaintiff contends that she submitted her first request for a tape and transcript along with her December 21, 2000 Request for Review.  Nonetheless, there is no such document in the record.

§636(c).  **[Doc. 19]**.

## Standard of Review

In reviewing the Commissioner's findings this Court first determines whether the Commissioner's findings are supported by substantial evidence in the record. *Andrade v. Secretary of Health & Human Servs.,* 985 F.2d 1045, 1047 (10th Cir. 1993). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1988)) (additional citations omitted). In determining whether the Commissioner's findings are supported by substantial evidence, the Court does not undertake a *de novo* review of the evidence. *Sisco v. U.S. Dep't of Health & Human Servs.,* 10 F.3d 739, 741 (10th Cir. 1993). The Court should not re-weigh the evidence, nor should it substitute its judgment for that of the Commissioner. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994). Instead, the Court should meticulously examine the entire record to determine if the Commissioner's decision is supported by more than a scintilla, but less than a preponderance, of evidence. *See Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1988); *Sisco,* 10 F.3d at 741.

Second, the Court determines whether the Commissioner applied the correct legal standards. *Andrade*, 985 F.2d at 1047. "The 'failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.'" *Id.* (quoting *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir. 1984)) (additional citations omitted).

To be eligible for SSI benefits, a claimant's income and financial resources must fall below a certain level, and he or she must meet the statutory definition of an "aged, blind or disabled" person. *See* 42 U.S.C. § 1382(a).

In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. *See* 42 U.S.C.§423(d)(1)(A); *see also Thompson v. Sullivan,* 987 F.2d 1482, 1486 (10th Cir. 1993). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R.§ 404.1520(a-f). The sequential evaluation process ends, if, at any step, the Commissioner finds the claimant is not disabled. *See Thompson*, 987 F.2d at 1487.

At the first three levels of the sequential evaluation process, the claimant must show: (1) that she is not engaged in substantial gainful employment; (2) that she has an impairment or combination of impairments severe enough to limit the ability to do basic work activities; and (3) that her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpart P, App. 1. If the claimant cannot show that she has met or equaled a listing, she must show at Step Four that she is unable to perform work she has done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

### Medical History

Plaintiff was seen in August of 1994 by Arlin Cooper, M.D. for symptoms of depression including crying spells, trouble concentrating, irritability, despondency, anergia, anhedonia and trouble sleeping. Tr. 121. She denied any suicidal ideation. *Id.* She was working up to 80 hours per week at that time. *Id.* She continued to have visits with Dr. Cooper through 1994 and early 1995. *Id.*

In May, 1995, Dr. Cooper's diagnosis was major depression, single episode and possible post traumatic stress disorder, delayed type. *Id*. Her medication consisted of Zoloft, 100 mg daily; Restoril, 15 mg HS PRN; and Valium, 2 ½ mg BID PRN. *Id*. Her prognosis was good. Tr.122.

In March, 1998, Plaintiff returned to Dr. Cooper because of a reported exacerbation of her illness in the summer of 1997. Tr. 118, 122. She reported that she had discontinued using her medications two years prior. Tr. 122. Dr. Cooper prescribed Zoloft, Valium and Restoril. *Id.* His diagnosis was Major Depressive Disorder, recurrent (296.4). *Id.* He opined that Plaintiff "...is disabled at this present time." Id. Plaintiff treated with Dr. Cooper through June 19, 1998. Tr. 113 - 120. During her last visit with Dr. Cooper, Plaintiff reported having more good days than bad and that she seldom used Restoril. Tr.113. She did, however, complain of a lot of initial sleep disturbance. Tr. 114. She also reported that her appetite was widely variable, although her weight remained stable. *Id.*

In June, 1998, Plaintiff started treatment with Western New Mexico Counseling Services ("WNMCS") in Gallup. Tr. 304 - 312. The initial Master Treatment Plan, completed on August 4, 1998, indicated that Plaintiff had been referred by her Primary Care Physician for concerns regarding depression and anxiety. Tr. 305. Plaintiff was noted to be easily distracted and to cry easily. Tr. 306. The examiner reported that Plaintiff denied suicidal intent or plan but reported occasional suicidal thoughts. Tr. 307. She reported sleeping only four hours a day. Tr. 308.

Plaintiff continued to treat at WNMCS complaining of memory problems and anxiety. She was seen on August 18, 1998 and was labile, crying and agitated throughout the session. Tr. 302.

Her GAF was assessed to be 60.² *Id.* On August 28, 1998 she had complaints of anxiety and displayed emotional lability. Tr. 300. On that date her GAF was assessed to be 50.³ *Id.* A treatment note from September 5, 1998 indicated that Plaintiff was doing better. Tr. 299.

On November 18, 1998, a Mental Health Status report was prepared by WNMCS. Tr. 288. Plaintiff was noted to be emotionally labile with low energy levels. *Id.* The evaluator opined, "At this time, she does not seem to have either the energy, the emotional stability, or the attention and concentration necessary to maintain employment." *Id.* In a session two days later, Plaintiff reported severe difficulty in sleeping. Tr. 285.

In mid-December of 1998, Plaintiff was put on Paxil and it was noted that Plaintiff was doing okay and that the medication change was positive. Tr. 281. In early 1999, Plaintiff was still reporting mood swings and worsening depression. Tr. 190, 276-77. However, by January 13, 1999, Plaintiff was seen to be generally stable and making minimal progress. Tr. 273. A note from February 10, 1999, indicates that Plaintiff was much more upbeat and better able to stay on track, less labile, but hesitant to work toward a goal of no treatment. Tr. 272. On February 24, 1999, her GAF was assessed to be 70.⁴ Tr. 265. In March, she was noted to be sleeping better, had less anxiety and was

---

²The GAF (Global Assessment of Functioning) is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.2000). A GAF score of 51 - 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id.* at 34.

³ A GAF score of 41-50 indicates "serious symptoms (e.g. suicidal ideation....) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.2000).

⁴A GAF of 61-70 indicates some mild symptoms or some difficulty in functioning but "generally functioning pretty well, has some meaningful interpersonal relationships." American

doing better overall. Tr. 258-9.

On March 26, 1999, a Comprehensive Psychiatric Consultation report was prepared by Robert L. Karp, M.D. in Albuquerque. Tr. 147. Dr. Karp evaluated the Plaintiff on March 24, 1999 at the request of Disability Determination Services. *Id.* Plaintiff stated that she couldn't work because "my hands, and my shoulder, and a lot of problems." *Id*. Plaintiff reported difficulty falling asleep, with frequent awakening and difficulty failing back asleep. *Id*. She stated that her appetite was up and down and that she had gained 20 pounds in the last six months. *Id.* Plaintiff stated that her concentration was poor, that she had crying spells every day and that she had suicidal thoughts about once a month for the last four months. *Id*. She was exercising, doing laundry, taking care of all of the chores around the house, doing needlepoint, walking her dog, working in the yard, preparing meals and helping her children with their homework. Tr. 147-48. Dr. Karp's impression was moderate depression with a GAF of 60. Tr. 149. He found her to be symptomatic with sleep problems, appetite problems, concentration and bowel problems, occasional suicidal ideas and crying spells. *Id.* Dr. Karp believed that there was a strong histrionic component to Plaintiff's symptoms. *Id.* Dr. Karp concluded by stating that Plaintiff had "no impairment in her ability to understand and remember simple instruction but had a slight impairment in her ability to persist and concentrate at tasks of basic work, mild to moderate impairment in her ability to get a long with others and adjust to changes in the work place." Tr. 150.

A Discharge/Transfer summary prepared in May by WNMCS, indicated that Plaintiff's course of therapy had been variable and that although she continued to be highly emotional and labile, she

---

Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed.2000).

appeared to be more focused, less distracted and displayed fewer memory deficits. Tr. 176. It noted her most recent GAF to be 70. *Id.* The primary diagnosis was Bipolar Disorder, Most Recent Episode Mixed and Post Traumatic Stress, Delayed Onset. *Id.* A clinic note from that same date indicated that Plaintiff was "as stable as she has ever been." Tr. 177. Nonetheless, a Mental Health Status report from WNMCS (prepared by Plaintiff's new counselor) dated May 28, 1999 indicated that Plaintiff did not have the energy, emotional stability or attention and concentration to maintain employment. Tr. 183.

In early June, Plaintiff began deteriorating with decreased mood, increased anxiety, hopelessness and thoughts of suicide. Tr. 163, 171-73. On June 8, 1999, she was admitted to Rehoboth McKinley Christian Hospital Behavioral Health Services for depression and suicidal thoughts. Tr. 214-16. During her hospitalization, her physicians believed that there was a iatrogenic component to Plaintiff's problems because she was on a "rather large dose of medication." Tr. 210. By the time Plaintiff was discharged from the hospital on June 11, 1999, she had a GAF level of 80.[5] *Id.*

After moving to Albuquerque in July, 1999, Plaintiff sought treatment from Steven I. Sacks, M.D. Tr. 344-45. Dr. Sacks treated her with diazepam, Paxil and Depokote for her diagnosis of bipolar disorder. *Id.* Plaintiff exhibited clinical symptoms of depression and hypomania but was compliant with her psychotropic medications. *Id.* Dr. Sacks referred Plaintiff to Judy Talley, MA, LPCC for counseling to deal with her pending divorce and her relationship with her children. *Id.*

---

[5]A GAF of 71-80 indicates possible transient symptoms which are "expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or social functioning (e.g., temporarily falling behind in schoolwork)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed.2000).

Both Dr. Sacks and Ms. Talley believed that vocational rehabilitation help would benefit the Plaintiff. *Id*. However, when this was expressed to Plaintiff, she became very angry and stated, "I have worked my whole life. I'm tired of working." *Id.* Shortly afterward, Plaintiff stopped treatment with both Dr. Sacks and Ms. Talley. *Id.*

Plaintiff then sought treatment from Timothy Schuster, M.D. who performed an Initial Psychiatric Evaluation of Plaintiff on November 8, 1999. Tr. 340-41. Plaintiff was restless, anxious, tearful and her speech was fairly unorganized. Tr. 340. Her insight and judgment was fair, her recent memory was intact but her remote memory was impaired. *Id.* She expressed some suicidal ideation but stated that her children kept her from doing anything. Tr. 341. She was diagnosed with bipolar disorder, mixed and possible post traumatic stress disorder. *Id.*

Plaintiff returned to Dr. Schuster on January 17, 2000. Tr. 365. He found her condition to be worse and her mood to be depressed and angry. *Id*. However, when she returned on February 11, 2000, she was doing better. Tr. 364. She stated that she was happier than she had been in quite a while and attributed this change to being compliant with her medication. *Id.* She was anxious but alert and oriented and had no suicidal ideation. *Id.*

Plaintiff has had a long history of left shoulder pain and hand and wrist pain. See, generally, Tr. 185-204. In May, 1999, her treating physician at Western New Mexico Medical Group, Dr. Verne, referred her to an orthopedic specialist in Albuquerque. Tr. 250. On August 9, 1999, Plaintiff saw Dr. Bernstein at New Mexico Orthopaedic Associates. Tr. 322. At that time, Plaintiff's diagnosis was bilateral carpel tunnel syndrome and left shoulder impingement. *Id.* After examining the Plaintiff, Dr. Bernstein believed that there was evidence of bilateral carpel tunnel syndrome and that Plaintiff would benefit from nerve studies. Tr. 322-23. He also wanted to try an injection into

9

the subacromial space of her left shoulder. Tr. 323.

Plaintiff returned to Dr. Bernstein on August 31, 1999. Tr. 321. He noted that the nerve study "showed very mild evidence of some slowing of the median sensory conduction across the wrist. The left sensory conduction was felt to be normal." *Id.* Her diagnosis was changed to right carpal tunnel syndrome and left shoulder impingement. *Id.* Dr. Bernstein injected the right carpel tunnel with Lidocaine and Celestone. *Id.* The Plaintiff reported that the injection given for her left shoulder at the previous visit seemed to help with the pain. *Id.* Dr. Bernstein wanted to get Plaintiff in therapy to work on stabilizing and strengthening her rotator cuff muscles. *Id.*

On December 21, 1999, the Plaintiff presented again to Dr. Bernstein complaining of pain with all motions to her shoulder. Tr. at 320. Dr. Bernstein commented, "It's difficult to really appreciate a significant impingement sign because there is some symptom magnification with any type of motion to the shoulder. She does not have any detectable weakness of her supraspinatus, subscapularis or infraspinatus or weakness of her deltoid muscle." *Id.* Dr. Bernstein wanted to get an MRI to evaluate the rotator cuff but was concerned that Plaintiff was not a "good candidate for surgery because of the amount of her pain complaints, they may be out of proportion to her examination." *Id.* As to her carpel tunnel syndrome, the Plaintiff reported that the injection did not help at all and that she still had numbness and tingling. *Id.* Dr. Bernstein did not think that Plaintiff was a good candidate for carpel tunnel release since she had no significant benefit from the steroid injection. *Id.*

## Analysis

### Issue One:  Whether consideration should be given to new evidence

Plaintiff's first contention is that consideration should be given to new evidence, specifically

10

an October 12, 2000, psychosocial assessment done by Transitional Living Services ("TLS").[6] Plaintiff argues that the Appeals Council failed to provide her with a copy of the exhibit file which resulted in a denial of her claim without opportunity to submit additional evidence or written argument. According to the Good Cause Statement provided to the Appeals Council by Plaintiff's present counsel, Plaintiff was homeless during 2000 and lived in various shelters. Tr. 10. Because of her situation, she never received notice of the ALR's unfavorable decision of June 28, 2000. *Id.* Nor was she ever made aware that her attorney had withdrawn his representation of her claim and had not appealed her case. Id. In late December, 2000, Plaintiff was put in contact with her present counsel by a case manager at Transitional Living Services. *Id.*

Through her new counsel, Plaintiff submitted a Request for Review on December 21, 2000. Tr. 366. Included with the Request for Review were numerous exhibits including three pages of records and notes from Transitional Living Services, Inc. Tr. 367-369. Plaintiff alleges that she requested a tape and transcript of her February 23, 2000 hearing by certified mail on December 21, 2000 but that no response was received. The record does not contain a copy of the December 21, 2000, request for a tape and transcript. Plaintiff submitted a Second Request for Tape and Transcript to the Social Security Administration on October 11, 2001. Tr. 9. On November 8, 2001, the Social Security Administration forwarded duplicate cassettes of Plaintiff's hearing to her counsel. Tr. 8. At that same time, the Appeals Council directed Plaintiff to forward any additional evidence "that is both new and material to the issues considered in the hearing decision dated June 28, 2000" to the

---

[6]Plaintiff refers to this assessment as Exhibit A to her Memorandum Brief and states that it is attached to the brief. No such exhibit was found attached to the brief or in the entire district court file. However, Exhibit A was attached to a courtesy copy of the Memorandum Brief that was provided to this Court by Plaintiff.

Council within 40 days from the date of the November 8, 2001 letter. *Id.* On January 23, 2002, the Appeals council denied Plaintiff's request for review and thereby, rendered the ALJ's decision final.

Plaintiff argues that had the Appeals Council allowed for submission of a brief and additional evidence, it would have been provided. She states that because she was never provided with a copy of the exhibit file from the February 23, 2000 hearing, she was not able to determine what records the Appeals Council had or to submit argument. The Court finds Plaintiff's argument to be without merit. Plaintiff should have known that neither the ALR or the Appeals Council had a copy of the assessment made by TLS. The assessment was done on October 12, 2000, almost eight months after the hearing and almost four months after the ALR's decision on June 28, 2000. Plaintiff implicitly acknowledged that nothing had been done on her case once the decision of the ALJ had been received by her former counsel. In addition, Plaintiff was given additional time to present new evidence and make argument. Tr. 8. No evidence or argument was submitted, nor was a request for an extension of time to submit evidence and/or legal argument made. If new evidence is presented directly to a reviewing court, the court may remand to the Commissioner only if the evidence is material and the claimant shows "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Plaintiff has failed to show good cause for the failure to provide this evidence to the Appeals Council.

Furthermore, to warrant a § 405(g) remand, "we normally must determine that the new evidence would have changed the [Commissioner's] decision had it been before him." *Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir.1991). Additionally, the evidence must relate to the time period for which the benefits were denied. *Id.*

The new evidence in question is a psychological assessment done at TLS on October 12,

12

2000. Ex. A to Plaintiff's Memorandum Brief. The assessment refers to several factors which were not present at the time of Plaintiff's initial review including homelessness and cocaine/crack addiction. *Id.* This new evidence is "not material" to Plaintiff's condition during the relevant period. The regulations provide that if new evidence is submitted, it should be considered "only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 CFR § 404.970(b), 20 CFR §416.1470(b).

The psychological assessment may show that Plaintiff's psychological condition deteriorated, but it does not establish that she was disabled at the relevant time. *See Godsey v. Bowen,* 832 F.2d 443, 445 (7th Cir.1987) (stating that evidence of deterioration in 1986 does not show that "it was otherwise than found at the administration hearing," held in 1983); *see also Sanchez v. Secretary of Health & Human Servs.*, 812 F.2d 509, 512 (9th Cir.1987) (stating that new evidence indicating deterioration after the hearing would be material to a new application, but is not probative of claimant's condition at the time of the hearing). Plaintiff's showing in the district court does not justify a remand for consideration of the TLS psychological assessment.

### Issue Two:  Whether the ALJ's Analysis under the Listings of Impairments is supported by substantial evidence

Plaintiff contends that the ALJ erred by failing to perform the requisite analysis under the Listings of Impairments by failing to perform any analysis whatsoever. Plaintiff contends that she should have been evaluated under the Listing of Impairments under §12.04 - *Affective Disorder* for either *Depression* or *Bi-Polar Disorder* and under §12.05 - *Anxiety Disorder.* Plaintiff maintains that she has symptoms that more than meet the "A" and "B" criteria of the Listings of Impairments at §12.04 - *Affective Disorder* and §12.06 - *Anxiety Disorder.*

Plaintiff is correct when she states that an ALJ is required to discuss the evidence and explain why he or she found the claimant was not disabled. *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1995). Under the Social Security Act,

> [t]he Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.

42 U.S.C 405(b)(1). When there is evidence of a mental impairment, the procedure for evaluating mental impairments set forth in 20 CFR §404.1520a must be followed and the procedure must be documented. *Cruse v. United States Dept. of Health and Human Servs.,* 49 F.3d 614 (10th Cir. 1995).

There must first be a determination of whether there are "certain medical findings which have been found especially relevant to the ability to work." *Cruse,* 49 F.3d at 617 (citing 20 C.F.R. §404.1520a(b)(2)). This is sometimes referred to as the "Part A" criteria. *Id.* Then, the degree of functional loss resulting from the impairment must be evaluated using the "Part B" criteria. *Id.* Listings 12.04 and 12.06 require a finding of at least two of the following for the Part B criteria to be met:

 1. Marked restriction of activities of daily living; or
 2. Marked difficulties in maintaining social functioning; or
 3. Marked difficulties in maintaining concentration, persistence or pace; or
 4. Repeated episodes of decompensation, each of extended duration.

*Cruse,* 49 F.3d at 617, citing 20 CFR §404.1520a(b)(3); Pt 404, Subpt. P, App. 1, §12.04B. The ALJ then completes the Psychiatric Review Technique Form (PRTF) with or without the assistance

of a medical advisor and attaches the form to his or her written decision. *Cruse,* 49 F.3d at 617.

In this case, the ALJ provided a detailed analysis of the medical evidence in the body of his report and completed a PRTF, identifying Listings 12.04 and 12.06 as categories upon which the medical disposition was based. Tr. at 24  Although the ALJ did not state the particular Listings in his report, the PRTF adequately identified them.

Under criteria A, the ALJ found the presence of bipolar affective disorder; mixed (12.04) and possible post traumatic stress disorder (12.06). These findings are not disputed by the Defendant and are supported by the medical record. Under the B criteria, the ALJ found that Plaintiff had only slight restriction of activities of daily living; moderate difficulties in maintaining social functioning; seldom had difficulties in maintaining concentration, persistence, or pace; and never had episodes of deterioration or decompensation in work or work-like settings. These findings, too, are supported by and are consistent with the medical evidence. Accordingly, this Court finds that the ALJ's analysis under the Listings of Impairments is supported by substantial evidence.

Plaintiff also contends that there should have also been a finding of depressive syndrome under listing 12.04 as she had previously been diagnosed with Major Depressive Disorder. However, a treatment summary of May 19, 1999, indicates that Plaintiff's diagnosis had been changed from major depression to bipolar disorder. The diagnosis of bipolar disorder was subsequently verified by Dr. Sacks in 1999 and Dr. Schuster in late 1999 and early 2000. Thus, this Court finds no error in the ALJ not making a finding of depressive syndrome under listing 12.04.

### Issue Three:  Whether the ALJ's determination regarding Plaintiff's residual functional capacity is supported by substantial evidence.

Plaintiff contends that the ALJ erred when he failed to include all severe impairments in his

Residual Functional Capacity findings.  Plaintiff contends that the ALJ should have found restriction in Plaintiff's ability to perform repetitive, manipulative tasks and should have considered the report of Dr. Bernstein who found that she had pain with all motions of her left shoulder.  Finally, he should have found that Plaintiff should only have minimal contact with people.

Plaintiff argues that there is a contradiction in the findings.  Plaintiff contends that the ALJ found her right carpal tunnel syndrome to be a severe impairment but, nevertheless, he indicated that the only restriction in the use of her right arm was a limited ability to push and pull.  Plaintiff argues that the ALJ should have found restriction in Plaintiff's ability to perform repetitive, manipulative tasks.  The ALJ has the responsibility to ensure that "an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dept. of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993).  Generally, "[a]n ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing."  *Carter v. Chater,* 73 F.3d 1019, 1022 (10th Cir. 1996).

In this case, there is very little, if any, medical evidence in the record as to what Plaintiff's restrictions are as a result of her right carpel tunnel syndrome ("CTS").  In May of 1999, Dr. Verne indicated that Plaintiff had severe bilateral CTS which was currently preventing her from working and he referred Plaintiff to an orthopedic specialist.  Tr. at 250.  Dr. Bernstein, an orthopedic specialist, evaluated Plaintiff in August, 1999 and found her to have full range of motion to her wrist.  Tr. at 322  A nerve study was performed and showed  very mild evidence of some slowing of the median sensory conduction across the right wrist but the left sensory conduction was felt to be normal.  Tr. 321.  Plaintiff's diagnosis was then changed to right carpel tunnel syndrome.  *Id.*  Plaintiff returned to Dr. Bernstein in December, still complaining of numbness and tingling.  Tr. 320.   At that time Dr.

Bernstein was reluctant to perform surgery because he did not believe that Plaintiff was a good surgical candidate, given that she had no significant response from a steroid injection he did in August. *Id.* There are no other records from Dr. Bernstein in evidence.

The ALJ stated in his report, "The claimant also testified at the hearing that she had recently had surgery on her right wrist which, following a period of recuperation, can reasonably be expected to reduce the degree of impairment limitation currently establish by the evidence of record." Tr. 19. In concluding that Plaintiff's "capacity for light work is diminished by a limited ability to push and pull with the right upper extremity," the ALJ stated he considered the assessments of the State Agency physicians at the reconsideration level and found them to be in basic agreement with, and supportive of, his findings. Tr. 20. However, the findings referred to by the ALJ do not address Plaintiff's right CTS but, instead, address her left shoulder issues. Tr. 240-247.

This Court finds that the record is not fully developed to provide the necessary medical evidence regarding any restrictions on the use of Plaintiff's right upper extremity due to her right CTS and as such, remand is required.

Plaintiff also contends that the ALJ failed to consider Dr. Bernstein's report and argues that the ALJ should have found greater restriction with her left upper extremity in light of Dr. Bernstein's finding that she had pain with all motions of her left shoulder. The last note in the record from Dr. Bernstein is dated December 21, 1999. Tr. 320. At that time, Dr. Bernstein was concerned about symptom magnification and whether Plaintiff was a good candidate for surgery because "of the amount of pain complaints, they may be out of proportion to her examination." *Id.* However, he did want to have an MRI done for further evaluation of Plaintiff's left shoulder. *Id.* Although a January 17, 2000, note of Dr. Schuster's states that Plaintiff told him that the MRI showed a torn

17

rotator cuff (Tr. 365), there are no records in evidence regarding the results of the MRI. Again, as with Plaintiff's right CTS, there is no medical evidence from a treating physician in the record regarding Plaintiff's left shoulder restrictions and whether Dr. Bernstein was considering surgery and, therefore, remand is required.

Finally, Plaintiff argues that the ALJ's restriction from work requiring "significant" public contact or "extensive" interaction with supervisors and co-workers is "both unclear and inconsistent with findings suggesting that she should have only minimal contact with people." This Court finds Plaintiff's argument to be without merit as it sees no inconsistency in the ALJ's findings regarding this issue.

**Issue Four: Whether the ALJ properly relied on vocational expert testimony**

Plaintiff contends that the ALJ erred when he relied on vocational expert (VE) testimony that was inconsistent with both his own findings and with the evidence as a whole. Plaintiff suggests that the VE testimony was "non-responsive to the ALJ's hypothetical question and was not consistent with [her] residual functional capacity..." Plaintiff contends that her restrictions would preclude her from performing the occupations proposed by the vocational expert. As noted above, the record is not developed enough for a determination to be made regarding Plaintiff's residual functional capacity. Until such a determination is made, Plaintiff's fourth issue cannot be addressed.

**Conclusion and Summary**

In sum, I find that the ALJ's determination regarding Plaintiff's residual functional capacity, specifically restrictions regarding her right CTS and left shoulder were not supported by substantial evidence and should be reversed.

Where a decision by the Commissioner is reversed, this Court has discretion to remand the

case for further administrative proceedings or to order an immediate award of benefits. *Ragland v. Shalala,* 992 F.2d 1056, 1060 (10th Cir. 1993). Because I do not think the evidence presently in the record is sufficient to determine Plaintiff's residual functional capacity, I find that remand for further administrative proceedings is appropriate.

On remand, the Commissioner should further develop the record as to the issues of Plaintiff's right CTS and left shoulder problems. Specifically, the Commissioner should make efforts to obtain records of Plaintiff's MRI, the surgery on Plaintiff's right wrist and any follow up records by Dr. Bernstein or other treating physicians.

If such records do not provide sufficient information to determine Plaintiff's restrictions, the Commissioner should order a consultative examination.

 

_____
**W. DANIEL SCHNEIDER**
United States Magistrate Judge